DAVID W. OLIVER, DEFENDANT IN ERROR, v. THE MAYOR AND ALDERMEN OF JERSEY CITY AND THE GREENVILLE AND HUDSON RAILWAY COMPANY, PLAINTIFFS IN ERROR.

Argued June 26 and 27, 1899—Decided November 20, 1899.

1. An officer legally elected and qualified who enters upon the duties of his office and afterwards is appointed to and accepts another office, but in good faith continues to publicly discharge the duties of the first, his term not having expired and no successor having been appointed or elected in his stead, nor any adjudication made against his title, is an officer *de facto.*

2. The official acts of an officer *de facto* are valid as far as the rights of third persons and the public are concerned, unless the defects in the officer's title are notorious and sufficient to overcome the apparent evidence to the contrary; but when they see a person occupying an important public office by virtue of an election by the people and publicly exercising its duties within the period for which he was elected, they are entitled to consider him to be such officer and will be protected in their rights if they do so.

3. When a person legally holding one office is elected or appointed to another, but is prohibited by a statute from holding both, upon accepting the second his *de jure* title to the first ends, and his successor may at once be appointed or elected; but if the former occupant refuses to vacate the office, his successor will be compelled to take the necessary legal steps to oust him.

4. When an action is begun, the object of which is only to determine the validity of an act or thing done by an officer, and not involving his integrity or want of good faith, the officer himself is not a necessary party to the suit.

On error to the Supreme Court. For opinion of the Supreme Court, see *ante p.* 96.

For the plaintiffs in error, *Charles L. Corbin* and *William D. Edwards.*

For the defendant in error, *Charles D. Thompson* and *Richard V. Lindabury.*

The opinion of the court was delivered by

Nixon, J. On September 19th, 1898, the board of street and water commissioners of Jersey City passed "An ordi-

nance granting to the Greenville and Hudson Railway Company permission to cross Communipaw avenue with its tracks at grade and regulating such crossing." The ordinance was vetoed by the mayor, but was passed again, notwithstanding the objections of the mayor, on the 3d of October, 1898.

The defendant in error, a resident and taxpayer of Jersey City, was allowed a writ of *certiorari*, and a judgment of the Supreme Court was afterwards obtained setting aside the ordinance, and this writ of error brings that judgment before us for review.

While numerous reasons are assigned in the record, they all centre around two propositions—first, whether the defendant in error has such an interest in the subject-matter of the writ as to give him a legal standing to prosecute it. The court below adjudged that he had, and we concur in the conclusion reached by that court and find no occasion to add anything to the reasoning and authority by which it is supported. The second proposition relates to the validity of the ordinance itself. It is contended that the board of street and water commissioners has no power to authorize grade crossings. The court below sustained the right of the board, and in that conclusion also we agree. Such authority is given by *Gen. Stat., pp.* 471, 472, §§ 50, 51.

But the ordinance is assailed principally upon the ground that it was not legally adopted. The board of street and water commissioners is the governing body of Jersey City, and it enacts all the local laws of that city respecting streets and water. It consists of five members, and the ordinances passed are subject to the mayor's approval, and if vetoed by him may be again passed, notwithstanding his objections, by four votes of the board. *Gen. Stat., p.* 465. The ordinance in question was adopted at a regular meeting held September 19th, 1898, there being four votes for and one against it. It was vetoed by the mayor on September 28th, and finally passed over his veto on the 3d of October, 1898, receiving the same number of votes. But the contention is that one of them was not such as could give efficacy to the ordinance. It

was cast by Robert G. Smith, who had been mustered into the United States service, as colonel of the Fourth Regiment of New Jersey Volunteers, on July 18th, 1898. The statute creating the board of street and water commissioners provides (*Gen. Stat.*, *p.* 465) that "no such commissioner shall accept or hold any other place of public trust or emolument within the elective franchise, nor any appointment to public office, unless he shall first resign his said office, and if he shall accept such other office without having resigned his office of such commissioner, upon his acceptance of such place of appointment his office shall thereupon become vacant."

While there has not been furnished the best proof that Smith actually accepted the office of colonel, yet in the absence of any rebuttal we shall hold, as did the court below, that it is sufficient and that he did accept such office.

It is also insisted by the plaintiffs in error that Smith should be made a party in this proceeding, but we think that where an action is instituted the object of which is only to determine the validity of the act or thing done by an officer, and not involving his personal integrity or want of good faith, the officer himself is not a necessary party. No allegation or proof of bad faith on the part of any one appears in the record.

The question at issue is thus narrowed down to the efficacy of Smith's vote in the adoption of the ordinance. Without his vote it could not have been passed over the veto; neither could it without every other vote it received; and it is not strictly accurate to say that his vote had any more potency than any other. After his appointment Smith continued to discharge the duties of his office as commissioner and was present and voted when the ordinance was adopted, as the official minutes show. It would therefore be a pure solecism to call the office vacant at that time except in the strictly legal sense of having no occupant with a *de jure* title. The acts done by Smith in respect to the adoption of the ordinance were neither more nor less than he would have done had the Fourth regiment never been organized. It is there-

fore manifest that the words of the statute (*Gen. Stat., p.* 465) already quoted, declaring that when a commissioner accepts another office his former office shall become "vacant," cannot mean, in a situation like this, that it is corporeally vacant, for the person lawfully elected to fill it remained in possession, discharging its duties. Mere words in a statute cannot alone make an office unoccupied which in fact is occupied. The legal meaning of the words in such circumstances is that the office has no occupant who holds by a good title in law, and that the appointing power may at once be exercised to fill it, or if it is an elective office, the people may elect, and no adjudication is required to declare the vacancy, although the newly-appointed or elected officer may find it necessary afterwards to resort to *quo warranto* proceedings to obtain actual possession of the office. Under the old rule of common law, that upon accepting another and incompatible office the first became vacant and the occupant refused to abandon it, a writ of *quo warranto* to determine the question of incompatibility was the remedy ; and where the common law has been superseded by statutes declaring a vacancy under like circumstances and the occupant remains, a similar course must be pursued to obtain possession or such other steps as the facts may warrant. There are familiar precedents in our own state which illustrate the rules here stated. In *Clark* v. *Ennis,* 16 *Vroom* 69–72, the court said: "It is clear, both upon reason and authority, that a statute declaring an office vacant for some act or omission of the incumbent after he enters upon his duties, does not execute itself." Also, *Clawson* v. *Thompson, Spenc.* 689 ; also, *State* v. *Parkhurst,* 4 *Halst.* 427, with a difference only in the attitude of the parties. The governor having appointed Parkhurst in Ogden's absence, the new officer took possession and Ogden became the prosecutor to regain possession. Had Ogden remained the title of the case would have been State *v.* Ogden, with the same result. The same practice prevails in other states, and the rule is clearly stated in *State* v. *Jones,* 19 *Ind.* 356, where it is said : "Where it appears, *prima facie,* that acts or events

have occurred subjecting an office to a judicial declaration of being vacant, the authority authorized to fill such vacancy, supposing the office to be vacant, may proceed before procuring a judicial declaration of the vacancy and appoint or elect, according to the forms of law, a person to fill such office; but if, when such person attempts to take possession of the office, he is resisted by the previous incumbent, he will be compelled to try the right and oust the incumbent, or fail to oust him, in some mode prescribed by law."

Smith, then, being in the office under color of a legal title *ab origine*, and no other person claiming a right to it, was he a commissioner *de facto?*  Lord Ellenborough, in 1805, in *Rex* v. *Bedford Level*, 6 *East* 356, said : "An officer *de facto* is one who has a reputation of being an officer, who assumes to be and yet is not a good officer in point of law."  This definition has never been questioned, and all those given by the text-writers since are little more than variations of this one.  Tested by this ancient or any modern definition, Smith must be held to have been such an officer when this ordinance was passed.  He certainly had color of title and reputation, for the legal voters of Jersey City elected him in the spring of 1898 a member of the board for the term of three years, and he duly qualified as such and entered upon his duties with the full knowledge and acquiescence of the public.  He had never resigned.  The board had not been abolished and his term had not expired.  It has been argued and the record shows that he had been absent from several meetings of the board, but it cannot be held that a vacant chair in itself makes a vacant office.  Such a rule would work bad results in most of our legislative or governing bodies.  The question in a case like this is not whether a member has been frequently absent but whether he was present and voted when the ordinance was adopted.  He did not assert a right which any other person claimed, or perform any official duties that any one else pretended to have any right to perform in his stead, but only those duties which belonged to the office he was elected to fill and which the law contemplated should be done

and the public expected him to do when they elected him, for the law creating the board provides that the judgment and wisdom of five commissioners should determine the questions that arise in the passage of ordinances concerning the streets. The board also recognized his membership. He participated in their proceedings, his name was called and vote recorded in the adoption of ordinances, and if not present his absence was duly noted in the official minutes. With all these facts and circumstances appearing in the record, and undisputed, we must hold that Smith was a commissioner *de facto.* This conclusion is in accord, we think, with the decisions in this state and elsewhere on this subject. In *Dugan* v. *Farrier,* 18 *Vroom* 383, Mr. Justice Dixon said : " One who assumes an office legally and in good faith remains in it after his title has ended is a *de facto* officer." The same doctrine was held in *Flaucher* v. *Camden,* 27 *Id.* 244. In *State* v. *Anderson, Coxe* 318, it was held that a person in the office of sheriff, although ineligible, was nevertheless sheriff *de facto* and his official acts valid. In *Clark* v. *Ennis,* 16 *Vroom* 69, a case where the sheriff failed to give bond with sureties, as required by law, and yet continued to discharge the duties of the office, he was held to be an officer *de facto* and his acts valid, although the law expressly declares that if any sheriff shall neglect, refuse or be unable to give such bond " the office shall expire and be deemed to be vacant." In the case of *Sheehan's Case,* 122 *Mass.* 445, one Mr. Hawkes, while holding the office of justice of the peace, was elected to the state legislature and had qualified and entered upon his duties, but continued to act as justice, although the constitution of Massachusetts provided that, upon accepting another office, that of justice should become vacant, but the court, by Mr. Justice Gray, said : " If Mr. Hawkes, by taking his seat in the house of representatives, ceased to be a justice *de jure,* he was, by color of the usual signs of judicial office, sitting in the court, using its seal, and attended by his clerk, and no other person having been appointed in his stead, a justice of the peace *de facto.*" Decisions of like import may be found in every state.

Smith being a commissioner *de facto* when he voted for the ordinance, it must, upon the application of well-settled legal principles, be held valid and effective as to the rights of the public and third persons. In *Mitchell* v. *Tolan*, 4 *Vroom* 195, Mr. Justice Depue said : "Premising that an officer is one who exercises the duties of an office under color of right, by virtue of an appointment or election to that office, as distinguished on the one hand from a mere usurper of an office, and on the other from an officer *de jure*, the acts of an officer *de facto* are valid as far as the rights of the public or third persons are concerned." In *Woodside* v. *Wagg*, 71 *Me.* 207, it was held that "the acts of a person exercising the functions of a valid public office by color of right will be deemed to be an officer *de facto* and his acts will protect third persons, although he has legally forfeited his office by the acceptance of an incompatible one." In *State* v. *Carroll*, 38 *Conn.* 449, it was said : "The *de facto* doctrine was introduced into the law as a matter of policy and necessity to protect the interests of the public and of individuals, where those interests were involved in the official acts of persons exercising the duties of an office without being lawful officers. It was seen, as was said in Knowles *v.* Luce, that the public could not reasonably be compelled to inquire into the title of an officer, nor be compelled to show a title, and these became settled principles of law." In *Wilcox* v. *Smith*, 5 *Wend.* 231, the court said : "The principle is well settled that the acts of officers *de facto* are as valid and effectual when they concern the public or the rights of third persons as though they were officers *de jure*. The affairs of society could not be carried on upon any other principle." In *Petersilea* v. *Stone*, 119 *Mass.* 465, Mr. Justice Devens said : "Third persons, from the nature of the case, cannot always investigate the right of one assuming to hold an important office, even as far as to see that he has color of title to it by virtue of some appointment or election. If they see him publicly exercising its authority, if they ascertain that this is generally acquiesced in, they are

entitled to treat him as such, and should not be subject to the dangers of having his acts collaterally called in question."

But this legal protection is not afforded where the defects in the title of the officer are notorious and such as to make those relying on his acts chargeable with such knowledge. What, then, may be considered notice sufficient to warn third persons and the public? The expiration of the term of an officer and the appointment or election and qualification of his successor, the resignation of a public officer, the abolition of the office itself by an act of the legislature, the refusal of the board or legislative body of which the officer is a member to recognize him, or the judgment of a court against the title of the officer, are such facts as third persons and the public are, as a general rule, required to take notice of. But in this case none of these facts existed, but just the contrary were known to every citizen of Jersey City. All knew that Smith had been legally elected; that he had not resigned; that his term had not expired; that no court had questioned his right to serve; that no one claimed a right to his seat; that the board had not been abolished; that the members recognized him as one of their number, and that he took part in their proceedings. All of these things were enough to confirm the belief of third persons and the public in Smith's right to serve them. If it was publicly known that he was colonel of the Fourth regiment, it was quite as publicly known on the 3d of October, when the ordinance was adopted, that the war with Spain had ended and only the terms of a formal treaty of peace were being considered. Whether he had in fact accepted the office of colonel, and what the nice distinctions are between *de jure* and *de facto* officers, they could not be expected to know, nor were they bound to know, before accepting the benefits of any ordinance he might by his vote assist in passing. Another significant proof of the general acquiescence of the public in Smith's exercise of the office appears in the fact that the mayor of the city whose veto, as printed in the record, manifests great hostility to the ordinance, well knew that the four votes that first passed it could

pass it over his veto, and who had the power to fill a vacancy in the board, if he believed that any existed, had failed to make any attempt to appoint a successor, although he had been mustered into service in July. The mayor as the chief representative of the public had, so far as the record shows, acquiesced in his exercise of the office, and in his veto message does not claim that any illegal vote was cast for the ordinance. We find nothing to offset all this public reputation of Smith's right to the office, except a notice by the attorneys of the prosecutor of an intention to apply for an alternative writ of *mandamus* to compel the mayor of Jersey City to appoint some one as commissioner in Smith's place. By its terms it only contemplated future action, and, when allowed, the hearing was fixed for the 17th of October, fourteen days after the adoption of the ordinance. This notice was served upon the mayor, and also upon the clerk of the board of commissioners. In any event, it was not notice to third persons and the public, and if they heard of it at all they would only know that some disputes had arisen as to Smith's title which might become the subject of future and perhaps tedious litigation, the result of which they could not anticipate. The board itself could not be required to stop business upon receipt of such a notice. It cannot be held that when a public legislative or governing body, about to act upon some important measure, receives a notice from the attorney of some person who is opposed to it that he intends to begin an action which, in its final result, may deprive a member of his seat, that all further proceedings must be postponed until that suit is ended. Congress does not stop business until all its contested seats are settled, nor does any other legislative body.

There are no facts in this case to justify us in relaxing the wise and ancient rule so deeply rooted in public policy, that the acts of *de facto* officers holding under color of a title originally lawful, when acting in good faith, will protect third persons and the public in their dealings with them, whether serving alone or as members of a governing or legislative body.

The ordinance in question is one of interest to all of the people of Jersey City, and they are the public whose rights are affected by its validity. The third persons whose rights are involved are the more than four hundred residents and taxpayers in the neighborhood where it is to go into effect, who petitioned the board to pass it, claiming that it will be of benefit to them, and another third party, corporate, is the railway company to which the right is granted to lay the tracks that will, it is alleged, greatly add to the convenience of a system of public traffic extending from Communipaw cove to the great lakes.

The learned counsel for the prosecutor have invited our attention to many cases, but we fail to discover their applicability to the facts in the record before us. There can be no difference of opinion as to all such as hold that when a person filling one office accepts another and incompatible one, his *de jure* title to the first ceases, and his successor may at once be appointed or elected, or that the acts of an officer whose term has ended and his successor has qualified and taken possession in his stead are void, or that the official acts of a city council done after the term for which it was elected has expired are illegal; also the acts of a board after it has been abolished by the legislature, or that the acts of one who has not, and never had, any color of title to the office, are void.

But this case rests entirely upon the question whether Smith when he voted for the ordinance in dispute was a commissioner *de facto*, and his acts, therefore, valid as far as the rights of third parties and the public are concerned. We hold that he was such an officer, and that the ordinance is valid. This conclusion results in a reversal of the judgment of the Supreme Court setting aside the ordinance.

*For affirmance*—GUMMERE. 1.

*For reversal*—THE CHIEF JUSTICE, DIXON, GARRISON, LUDLOW, BOGERT, NIXON, HENDRICKSON, ADAMS, VREDENBURGH. 9.