La Monte Cowles, Appellant, v. Independent School District of Rome, Appellee.

**SCHOOLS AND SCHOOL DISTRICTS:** Directors—Powers—Employment of Counsel. A school board has legal authority to employ an attorney, at the expense of the district, to defend the action of the board in contracting with one teacher and in refusing to contract with another, even though the actions in which the issue directly or indirectly arises are actions in form *personally* against the teacher and individual members of the board.

**OFFICERS:** Resignation—When Effective. Three members of a board of school directors of five members constitute a legal quorum to elect a successor to one of said three members who had theretofore resigned, with the intent (shared in by his fellow members) *that the resignation would not take effect until his successor had been elected and had qualified.*

**OFFICERS:** De Facto Officers—Collateral Attack. Members of a school board who are, in supposed compliance with the law, and in good faith, elected to fill vacancies caused by resignations, and who in good faith act as such members, are at least directors *de facto,* and their official· actions may not be *collaterally* assailed.

**OFFICERS:** Vacancies—Power to Fill—Majority of Quorum. Vacancies on an official board (which is empowered to fill vacancies) may be filled by a majority of a *quorum,* in the absence of a statute which requires a majority of the entire membership of the board.

Headnote 1:   35 Cyc. p. 952.   Headnote 2:   29 Cyc. p. 1404 (Anno.); 35 Cyc. p. 895.   Headnote 3:   29 Cyc. p. 1389; 35 Cyc. p. 886.   Headnote 4:   35 Cyc. p. 895.

Headnote 1:   L. R. A. 1917D, 246.   Headnote 2:   23 L. R. A. 681; 12 L. R. A. (N. S.) 1010; 22 R. C. L. 556.   Headnote 3:   22 R C. L. 588.

*Appeal from Henry District Court.*—Oscar Hale, Judge.

NOVEMBER 15, 1927.

Action to recover for legal services rendered to defendant school district. Judgment for defendant. Plaintiff appeals.— *Reversed.*

*La Monte Cowles* and *C. M. Fischer,* for appellant.

*J. V. Gray*, for appellee.

MORLING, J.—The questions presented in the briefs are whether the plaintiff was employed or his employment ratified by a board of directors so constituted as to legally authorize

1. SCHOOLS AND SCHOOL DISTRICTS: directors: powers: employment of counsel.

them thereto, and whether the services rendered were services rendered in behalf of the school board, or in defense of the individual rights of the teacher and of two ostensible members of the board, whose title to position and office was attacked. Defendant's contention on the first point is that the action of the school board ratifying plaintiff's employment was at a meeting at which there were only two legally qualified members present, and the two other purported members were not legally such; that there was no quorum and no power to act. With respect to the latter point, the claim is that the employment was to defend the rights of a teacher, and the services rendered were in defense of her contract and of the title of the two contested members to their office.

There is no conflict in the evidence. Plaintiff was employed September 8, 1914, by Baston, the president of the school board, and O'Laughlin, a director. Their title to their offices is not disputed. They informed plaintiff (he says):

"That a controversy had arisen over the primary teacher, and that there was an action being brought to restrain one Miss Talbot from teaching, and that the hearing was set at Wapello before Judge Hale, and wanted to know if I could go up with them. I asked them at the time if this action had been approved by the board, and they reported that it had. I didn't see the record for a long time afterward."

The minutes of the school board do not show prior employment, but in the record of the proceedings of September 9, 1914, is the adoption of a motion accepting "the action of the president of employing Attorney Cowles to defend Miss Selma E. Talbot in the matter of injunction proceedings," and "that all expenses in defending the same be borne by the district." The board, on July 27, 1914, at a time when it is admitted to have been legally constituted, voted to employ Miss Jennie Dicus as primary teacher, over Director O'Laughlin's opposition. On August 3, 1914, O'Laughlin unsuccessfully moved to rescind

her employment.  On August 10, 1914, the minutes record that
Director "John Sammons asked the president to accept his
resignation from the board of directors.  The president called
for nominations to fill vacancy made by the resignation of
John Sammons."  Nominations were made, but a tie prevented
election.  At a meeting held August 27, 1914, the minutes show:
Present, John Sammons, J. J. O'Laughlin, J. M. Baston.  Ab-
sent, William Wehrle, F. D. Swailes.

"* * * The president called for nominations to fill the va-
cancy of John Sammons.  Motion to prepare ballots 'to fill
vacancy of John Sammons' was carried.  C. O'Grady was nom-
inated, and according to the minutes, 'received two votes,' or
a majority of the quorum, and was elected to fill vacancy of
John Sammons, and was duly qualified by the president.  Moved
by O'Laughlin and seconded by O'Grady that the resignation
of F. D. Swailes be accepted."

· R. W. Swailes was nominated "to fill vacancy of F. D.
Swailes.  R. W. Swailes received the majority of the votes of
the quorum, electing him to fill the vacancy occasioned by the
resignation of F. D. Swailes, and duly qualified by the presi-
dent."  Motion was then made and carried "that the board
rescind their action of employing Miss Jennie Dicus as primary
teacher, and to hire a more efficient teacher for the primary
room."  The record shows that from that date O'Grady and R.
W. Swailes continuously (though sometimes absent) acted as
members of the board, and actively participated in the meetings
as directors.  According to the minutes, the board from that
time on was constituted of the three previously elected direc-
tors, Baston, O'Laughlin, and Wehrle, together with O'Grady
and R. W. Swailes.  They conducted the regular business of
the district, including the leasing of property, the purchase of
building material, the fitting of leased property, employing
teachers and janitor, fixing salaries, executing teachers' con-
tracts.  At the meeting of September 1, 1914, it is recorded
in the minutes that "Miss Selma Talbot made verbal applica-
tion before the board for the primary teacher for 2½ months,
at a salary of $50 per month," and motions employing her ac-
cordingly and directing that contract be drawn up and signed
were carried.  At the meeting of September 9, 1914, at which
Swailes, O'Laughlin, O'Grady, and Baston were present, and

. Wehrle absent, and at which the action accepting the employment of plaintiff, as above set forth, was taken, Miss Talbot, by request of the president, applied for the remaining six and one-half months of the school year. Motion to accept, at a salary of not less than $50 a month, was carried by the votes of Swailes, Baston, O'Laughlin, and O'Grady, Wehrle being absent. Contracts were made with Miss Talbot, and she entered on the performance of her duties. On September 7, 1914, Wehrle filed in the district court a petition against J. N. Hileman, the school district treasurer, and Miss Talbot, alleging, in substance, that Jennie Dicus was the duly elected teacher, and that Selma Talbot was not, praying judgment accordingly, and asking temporary injunction against the treasurer from paying Miss Talbot, and against Miss Talbot from teaching. A temporary injunction against the treasurer from paying Miss Talbot was entered September 12th, reserving the determination of her rights to final hearing. An amendment to the Wehrle petition was filed, setting up the pendency of actions in the court (presently noted), to determine the right of O'Grady and R. W. Swailes to the office of school directors. On October 7, 1914, an interlocutory decree was entered, reciting the pendency of proceedings in quo warranto (about to be noted), continuing the temporary injunction, and directing that the hearing on the right to a permanent injunction or any other matters involved in the action be had at the determination of the quo warranto proceedings, and that the whole matter in relation to Miss Talbot's right to teach be determined at the time of the final hearing, and after the disposition of the proceedings in quo warranto. We go back to September 24, 1914, on which petitions in quo warranto in the name of the state on the relation of Wehrle (the director) against O'Grady and R. W. Swailes were filed, demanding their ouster. On the same date, petition in quo warranto in the name of the state on the relation of Jennie M. Dicus and Wehrle was filed against Selma Talbot, asking that she be ousted. On the same date, a petition was filed by Jennie M. Dicus against Baston, president of the school board, praying for a peremptory writ of mandamus to execute contract for plaintiff's employment as teacher. In each of these cases the plaintiff here appeared and pleaded for the respective defendants. The cases were tried and judgments entered in favor

of the plaintiffs in quo warranto against O'Grady and Swailes, October 20th, and in favor of plaintiff and against defendant in mandamus, December 5, 1914. It is for services in these cases that plaintiff seeks to recover. Plaintiff testified that his different items of service all arose out of the attempted employment of Miss Talbot in place of Miss Dicus; that, in arguing the injunction case, "the matter had come up as to the qualification of Swailes and O'Grady as directors, and actions had been brought to oust them." He testified:

"I don't think it is possible for me to tell what the fees were for in the different cases. When you have three or four cases all relating to the same state of facts, you give time to them, but make no special division as to the time. * * * this whole matter was interlocked together; it was all a question as to Miss Talbot's right to teach, depending upon the contract with Miss Dicus, and her contract depended on whether the board that was elected had a right to rescind it, and that was determined in the mandamus case. They are all interlocked; it is all one proceeding."

He also says that the charges that were made after the court held that O'Grady and Swailes were not officers "were necessary charges in protecting the interest of my clients in the particular lawsuits that we already had pending,—like petition for new trial. * * * The school district was the only client I had. Q. You examined the records, to see whether the school board was properly elected? A. In my judgment, they were. It was determined by the court that they were not, but courts sometimes make mistakes. We did not appeal it to the Supreme Court, because it would have been a moot question by the time we got there."

The resigning directors appear not to have been present or to have participated in any of the proceedings of the board after their successors were appointed.

In the quo warranto cases, the court decided that O'Grady and R. W. Swailes were guilty of unlawfully holding and exercising the offices of school directors, and ousted them therefrom. In the mandamus case, it was held that Miss Dicus was entitled to teach. Though plaintiff was attorney in those cases, it is not, and we think cannot be, claimed that the judgments are res adjudicata as to him. 34 Corpus Juris 999.

According to the minutes of the proceedings of the board of directors on July 27, 1914, at which all of the members were present, "evidence against Miss Jennie Dicus as primary teacher were filed with the president." She apparently was the previous primary teacher. This so-called evidence consisted of written communications by various persons, to the effect that small boys were seen having immoral actions in the school yard at noon hour; that "I found the morality of the school in a very bad condition," that "I drew the attention of Miss Dicus to said condition, but she failed to take any action in the matter;" that complaints had been made to her about the treatment pupils had received from others; that she was inefficient. The minutes of that meeting further show:

"Moved by Swailes (F. D.) and seconded by Wehrle that Miss Dicus be employed to teach the primary room for a term of nine mo. . Voting aye: Sammons, Swailes, Wehrle. Voting no, J. J. O'Laughlin. Motion carried. Moved by Wehrle and seconded by Swailes that the primary teacher be allowed the same salary as last year,—$50 per month. Voting aye: Sammons, Swailes, Wehrle. O'Laughlin not voting. Motion carried."

It appears that no contract was signed, and, as noted, on August 3d O'Laughlin, without a second, moved to rescind. There is no evidence before us that the terms of any contract were ever proposed on the part either of board or teacher, or that Miss Dicus, prior to instituting the mandamus suit, accepted the employment. *Curttright v. Independent Sch. Dist.*, 111 Iowa 20. Whether, on this record, if she had accepted, it could be said that she had any legal standing as a teacher, no contract having been settled or entered into, is, to say the least, very doubtful. Code of 1897, Section 2778; *Gambrell v. District Township*, 54 Iowa 417; *Place v. District Township*, 56 Iowa 573. Clearly, as the case is presented here, there was, at most, only a proposition to employ Miss Dicus at $50 per month. No acceptance on her part appears. She was not bound, and obviously the board was not. It was open to the board to rescind its action and to employ another teacher. Though, on the record here, Miss Dicus had no contract, and the district was not liable for her salary, but Miss Talbot did have a contract, and the district was liable to her, Miss Dicus sued the treasurer

to compel him to pay her and to enjoin him from paying Miss Talbot. The suit involved two questions: First, whether the district was liable to Miss Dicus; second, who should teach the school. The interests of the district were at stake on both phases. If Miss Dicus should succeed, there might be a liability to Miss Talbot. It was, therefore, necessary, in the financial interest of the district, to make a defense. We think that, in the other aspect of the case, it was proper also for the board to make defense.

It is provided by Section 2759, Code of 1897:

"In all cases where actions may be instituted by or against any school officer to enforce any provision of law, the board may employ counsel, for which the school corporation shall be liable."

The board (the question of the legality of its action being passed, for the moment), rescinded its action purporting to employ Miss Dicus, and employed Miss Talbot. Miss Talbot actually entered upon and engaged in the discharge of her duties as teacher. If the board had the right to employ Miss Talbot, they had the right also to defend their action and enforce their determination as to who should teach. To hold that a dissenting director may bring a suit in court to annul the administrative action of the board, and that the board has no authority to justify or enforce its action at the expense of the district, would be to permit a dissenting director to tie the hands of the board and overcome the will of the majority by procuring a judgment by default. The first action was against the treasurer, to enjoin him from carrying out the order of the board to pay Miss Talbot her wages. It was in that that plaintiff was employed. The question was more than the personal right of Miss Talbot to her contract and to perform it and receive the compensation allowed therefor. The question was whether the board had the right to determine who should teach school: one whom the board thought and decided to be fitted, or one who the minority director thought ought to be, or legally had been, employed. Manifestly, it was for the board to determine who, in the interest of the district and for the welfare of the pupils, should do the teaching. In the aggregation of the cases, there was the one common and dominating issue: not merely whether O'Grady and R. W. Swailes were entitled to their offices, as against no

contenders, or whether Miss Talbot was entitled to the position and pay of teacher, as against Miss Dicus; but whether the determination of the majority of the *de facto* board as to who would best serve the educational and moral welfare of the school as a teacher should prevail. The board, having determined upon the teacher, had the right to enforce their determination in the court by defending a suit assailing their action.

Was the board, at the time it employed Miss Talbot and at the time it employed plaintiff, competent to take such action? Its members might be directors *de jure* or *de facto*. By Section 1265, Code of 1897:

"Except when otherwise provided, every officer elected or appointed for a fixed term shall hold office until his successor is elected and qualified, unless he resigns, or is removed or suspended, as provided by law."

It is somewhat otherwise provided with regard to school directors, by Section 2758, Code Supplement, 1913, that the director "shall hold the office for the term to which he is elected, and until his successor is elected and qualified. In case of a vacancy, the office shall be filled by appointment by the board until the next annual meeting." By Section 1266, Code of 1897, it is provided that:

"Every civil office shall be vacant upon * * * 4. The resignation or death of the incumbent."

Section 1268, Code of 1897, provides how resignations of sundry civil officers—not including, however, school directors—may be made. The resignation involves the intent on the part of the resigning official whether to make a present immediate resignation or to make one to take effect when accepted, or on some other event. His intent to resign with immediate effect involves the question of public interests,—whether the necessary performance of the duties of the office which he holds and the interests of the public will permit an immediately effective resignation. The resignation involves also the understanding and intent of the officer or board to whom it is made, whether they are advised of it, whether they accept it, and upon what condition as to time of taking effect. In *State ex rel. Westfall v. Blair*, 87 W. Va. 564 (105 S. E. 830), it is said:

"It is the policy of our laws that officers elected or ap-

2. OFFICERS: resignation: when effective.

pointed shall serve until their successors are elected or appointed and qualified. * * * The services of officers are necessary to government, and any vacancy in office, especially in an office which is necessary for government, tends to disorganization and disruption. In our form of government citizens must, in order to carry it on, accept public office and render official service. The state has the right to demand faithful official service from every citizen selected, within proper limitations and conditions, and under this principle laws in some jurisdictions have been predicated and upheld which impose penalties on a citizen who refuses to serve after having been selected for an elective office."

Referring to *People ex rel. Illinois M. R. Co. v. Supervisor*, 100 Ill. 332, it is further said:

"The court held that, under the laws, a person elected should serve until his successor was elected, or appointed, and qualified, and that the same rule would apply to a resignation; and an officer who had resigned was not *functus officio* until his successor was selected and qualified. * * * The Supreme Court of the U. S. made a similar decision, holding that, where a town officer seeks to prevent the performance of a duty by a hasty resignation, he must see that he resigns not only *de facto,* but *de jure;* that he resigns his office not only, but that a successor is appointed. The court said: 'An attempt to create a vacancy at a time when such action is fatal to a creditor will not be helped out by aid of the courts.' *Badger v. Bolles,* 93 U. S. 599. 'An officer whose resignation has been tendered to the proper authorities and accepted, continues in office and is not released from its duties and responsibilities until his successor is appointed or chosen and qualified.' *Jones v. City of Jefferson,* 66 Texas 576. See Dillon, Mun. Corp. (5th Ed.), Sec. 1522. A resigning officer must continue in the discharge of his duties until his successor is elected or appointed and qualified, and mandamus will lie to compel him to perform his duties."

See, also, 29 Cyc. 1402, 1404; *Meeker v. Reed,* 70 Cal. App. 119 (232 Pac. 760).

In *Gates v. Delaware County,* 12 Iowa 405, the superintendent of schools tendered his written resignation to the county judge, who, by the law then in force, was designated as the officer to whom it might be made. It was held that the law

did not invest the county judge with any discretionary power to refuse such resignation, and the right to lay down the office was clear; that there was no good reason for requiring that the resignation should be formally accepted in writing or recorded and the incumbent notified before it could be effectual. It was further said:

"Still it is true these acts should be done by which the officer to whom the resignation is to be made, and the public through him, may clearly understand that the office has been surrendered by the party resigning. Now, the plaintiff in this case made a formal unconditional written resignation * * * and placed the same into the hands of the county judge; who, by his clerk, had it indorsed a 'resignation,' with the date of its reception, and filed in his office without objection. * * * Such officer may fairly indulge the presumption that, unless his resignation has been returned to him, with objections, that it has been duly accepted; and this presumption the plaintiff did indulge; for, according to the evidence, he did not pretend to attend to any of the duties of the office for nearly four months thereafter, and until he first obtained leave to withdraw his resignation. * * * The plaintiff could only be reinvested with the office by a new election or appointment."

It seems to be clear, on this record, that neither Sammons nor his colleagues on the board understood or intended that his resignation took effect prior to O'Grady's election and qualification. The record of the meeting of August 27, 1914, is that the "house" was called to order by the president, J. M. Baston. On the roll call, Sammons, O'Laughlin, and Baston were noted as present; Wehrle and F. D. Swailes, absent. The minutes of the last meeting were read and approved. On the election by the board to fill vacancy, it is recorded, O'Grady "received two votes, or a majority of the quorum." The members of the board, therefore, including Sammons, counted a quorum as present. John Sammons's presence was necessary to the quorum. The intent of Sammons, as well as of the two other members present, plainly was that Sammons's resignation had not taken effect, and he was still a member. The board, therefore, was legally constituted, and had the power to elect a successor to Sammons. When O'Grady qualified, the board was competent to accept the resignation of F. D. Swailes and to elect R. W.

3. OFFICERS: *de*
*facto* officers:
collateral
attack.

4. OFFICERS: va-
cancies: power
to fill: majority
of quorum.

Swailes in his place.  On this record, the new members were such *de jure*.  But if, as defendant argues, they were not members *de jure,* they were such *de facto,* with authority as to third parties, including plaintiff and Miss Talbot, to transact the business of the district.  In the first place, we are cited to no statute which requires, to fill a vacancy, a majority of all the members elected.  In the absence of such a provision, the action of the body is determined by a majority of the quorum. *Thurston v. Huston,* 123 Iowa 157, 160; *Strohm v. City of Iowa City,* 47 Iowa 42; 28 Cyc. 335, 339.

O'Grady and R. W. Swailes took possession of the offices to which they were elected.  From that time, neither Sammons nor F. D. Swailes exercised any of the duties of their former offices.  The public business had to be transacted, and it was transacted.  The business of the board was conducted by the three original members, O'Laughlin, Baston, and Wehrle, and the newly elected ones, O'Grady and R. W. Swailes.  O'Grady and R. W. Swailes were recognized by the other members present in all the meetings of the board, as directors.  They had color of title and possession, and their possession was acquiesced in. · They were not intruders.  The office was a legally existing office. ·O'Grady and R. W. Swailes would be directors *de facto,* even though the officers who elected them were not themselves competent, or were without authority to make the appointment. 29 Cyc. 1392; *Martin v. Crook,* 155 Ala. 198 (46 So. 482) ; *Lavin v. Board of Com.,* 245 Ill. 496 (92 N. E. 291) ; *Tucker v. Roberts,* 151 Ga. 753 (108 S. E. 222).  In 2 McQuillin on Municipal Corporations 1278, Section 581, it is said:

"But where offices *de jure* exist, they may be filled by those whose official titles are defective.  Hence, where a majority of the members of a council have been unlawfully elected, and the council is thus illegally constituted, it is, notwithstanding, competent to exercise the functions of a lawful body.  So the vote of one ineligible to legally act as a member of the council is, nevertheless, valid, as he is a *de facto* member."

In *Magneau v. City of Fremont,* 30 Neb. 843 (47 N. W. 280), it is said:

"The names of Lowry and Peterson appeared upon the roll

of members, and they were recognized as such by other members of the council, as well as by the mayor and city clerk. They took part in the proceedings of the council on April 9th without objection from anyone, although Morse and Hein were at the time in the council chamber. We conclude, therefore, that Messrs. Morse and Hein were *de jure* officers, and that Lowry and Peterson were *de facto* members of the city council. The cases are numerous which hold that the acts of a *de facto* officer, so far as they involve the interests of the public or third persons, are as valid and binding as though he was an officer *de jure*."

See, also, *Oliver v. Mayor of Jersey City*, 63 N. J. Law 634 (44 Atl. 709).

"The acts of officers *de facto* are as valid and effectual, where they concern the public or the rights of third persons, as though they were officers *de jure*, and their authority to act cannot be questioned in collateral proceedings. *Stickney v. Stickney*, 77 Iowa 699; *State v. Powell*, 101 Iowa 382; *Metropolitan Nat. Bank v. Commercial St. Bank*, 104 Iowa 682, and cases there cited." *Bremer County v. Schröeder*, 200 Iowa 1285.

See, also, *Herkimer v. Keeler*, 109 Iowa 680; *Cochran v. McCleary*, 22 Iowa 75. The plaintiff was warranted in accepting the employment and acting in reliance on the approval of the *de facto* board. Idem; *Greenlee v. Cole*, 113 Ohio St. 585 (149 N. E. 711). It is true that, shortly afterward, the director Wehrle commenced quo warranto proceedings, and that plaintiff not only knew of them, but, as counsel, defended against them. Sammons and F. D. Swailes were not claiming the office. They never acted after their resignation. Their resignations were their voluntary acts, and persisted in. The quo warranto proceedings were not by one who claimed the title to the office and was seeking to perform its duties. The success of the quo warranto would merely leave vacancies in the constitution of the board. The business of the school board had to be carried on. It was not only the right, but the duty, of the board to carry on. The plaintiff had previously been legally employed. The plaintiff had the right to defend the board in their acts. While in form he was defending the titles of O'Grady and R. W. Swailes, in substance he was defending the action of the board in refusing to sign the contract with Miss Dicus and in

employing Miss Talbot. So far as plaintiff's employment was concerned, the quo warranto was no more than a dispute in regard to the title of the two directors brought into court as an incident to the main litigation. Neither the board nor plaintiff was required to stop business because of the pendency of such suit. *Oliver v. Mayor of Jersey City*, 63 N. J. Law 634 (44 Atl. 709).

No fraud or bad faith is charged, either against the plaintiff or against the board. The action which the board took was, as it assumed (and this is not contested), in the interest of the district and of its school and of the pupils. Plaintiff was not employed to defend a fraud perpetrated by the directors, nor was any such charge against the directors involved. As said in *Scott v. Independent District*, 91 Iowa 156, 160:

"* * * directors who are honest in the performance of their duties, even though mistaken as to their powers, and so acting illegally, have power to employ counsel, at the expense of the district, in a case instituted against them as such officers; while directors who knowingly act illegally or corruptly, or knowingly disregard their duty, whereby an injury results to the district, are deprived of the benefit of this statutory provision."

It will not do to hold that a dissenting member of a public board may, by attacking the title of an associate to his office, either transfer administrative matters to the court or compel a suspension of the public business until his lawsuit is decided. To so hold would be to put a premium on obstruction and coercive litigation.

That the services sued for were actually performed and the charges reasonable is conceded.—*Reversed*.

Evans, C. J., and De Graff, Albert, and Wagner, JJ., concur.